## WILLIAM TYSON and others *against* THOMAS POLLOCK, who survived WILLIAM POLLOCK.

### IN ERROR.

A. & Co. and B. & Co. contracted *jointly* to purchase from C. a quantity of wheat, for which they were to give the notes of certain banks, which were specified. A part of the wheat was delivered to A. & Co. and a part to B. & Co. without the knowledge of C., for which their respective receipts were taken. Afterwards A. & Co. gave drafts on E. at forty-five days, for the grain received by them; which the receipt stated would be considered as so much money, when paid. B & Co. also gave their draft at forty-five days on F. for the wheat they had received, in the acknowledgment of which it was set out, "that when paid it would be in full." On receiving these drafts, C. gave up the receipts which A. & Co. and B. & Co. had given for the grain.

*Held:* That by the acceptance of these bills, the *joint* contract of the partner firms, was not merged in their separate responsibility.

Each partner is separately the agent of the rest, with authority to pay the whole or any part of the debts, and payment by him is essentially payment on joint account.

THIS case came before the court on a writ of error to the District Court of York county, where judgment had been rendered for

(William Tyson and others *v.* Thomas Pollock, who survived William Pollock.)

the defendant in error who was there the plaintiff, on the following " special verdict."

The defendants, *Charles M. Poor, William Tyson* and *Nathan Tyson,* as *Tyson & Co.* and *Jesse M'Conky* and *Samuel Byrnes,* as *Byrnes & Co.* executed this *contract.*

"*York Haven,* 5th *April,* 1817.

These will certify that we have this day purchased of *W. & T. Pollock,* three thousand bushels wheat, at two dollars fifty cents per bushel, to be delivered on or before the 25th instant, if practicable, payable on delivery, or as soon thereafter as it may be called for in money of *Northumberland, Swatara, Harrisburg, York, Columbia, Lancaster* or *Baltimore banks.*

"*Tyson & Co.*
" For *Byrne & Co.*
"*Charles M. Poor.*"

The wheat therein mentioned was delivered agreeably thereto. It was forwarded by the plaintiff who resides on the Susquehanna, in Union county, in boats to the defendants' mills at York Haven, in York county, and there received by the defendants from the plaintiffs' boatmen, and divided equally by the two firms, in the absence of, and without the knowledge of the plaintiff or his partner; and the two firms severally delivered to the boatmen their respective receipts for the part by them severally received as aforesaid, which receipts were delivered to the plaintiff by the boatmen, and by the plaintiff afterwards delivered to the defendants, on their executing the drafts herinafter mentioned. After the delivery of the wheat as aforesaid, drafts were given to the plaintiff by *Byrnes & Co.* on *Samuel Byrnes* of Baltimore, dated York Haven, 10th May, 1817, payable forty-five days after date—two of them for two thousand dollars each, and two for three hundred dollars each, (which said drafts were all marked " accepted, *S. Byrnes,*") for the amount of wheat which that firm had received as aforesaid, and this receipt given by plaintiff:

" Received, York Haven, 10th May, 1817, of *Byrnes & Co,* four drafts, two of two thousand dollars each, and two of three hundred dollars each, making four thousand six hundred dollars; which when paid will be considered as such—deducting the discount— the drafts at forty-five days. "*Wm. & Thos. Pollock.*"

A draft also was given by *Tyson & Co,* for the amount of wheat which that firm received as aforesaid, on *W. & N. Tyson,* of Baltimore, dated 11th May, 1817, at forty-five days, in favour of the plaintiffs, for three thousand six hundred and thirty-five dollars and eighty-seven cents, which was indorsed, accepted and paid, for which a receipt was given by the plaintiffs as follows:

(William Tyson and others *v.* Thomas Pollock, who survived William Pollock.)

" Columbia, 11th May, 1817. Received of *Tyson & Co.* (mentioning the draft,) which when paid will be in full to this day, (the discount on the above deducted.)   *"Wm. & Thos. Pollock."*

The drafts of *Byrnes & Co.* were not paid, but protested and duly tendered to the defendants.

The mills of defendants, at York Haven, were owned separately, not jointly, one by *Tyson & Co.* the other by *Byrnes & Co.*

*Barnitz,* for the plaintiff in error.

Although the original contract may have been joint, yet as the wheat was delivered to each firm according to its interest, separate settlements made, and separate drafts taken from each, it was *executed* as several contracts, and all joint liability was gone. By the agreement the wheat was to be paid for on delivery—the drafts were a payment. Each firm was in full credit and perfectly solvent when the payments should have been made: but the plaintiffs taking drafts without the privity of the different firms, went out of the contract, and thus jeopardized the interests of the defendants. The receipt given "which when paid will be in full," meant that when the draft was paid, it would be in full of all liability of the drawers. The liability on the original contract would only exist while the contract was executory: but the delivery of the wheat, and adopting a mode of payment which separated the rights of the defendants, a different contract was executed, and the plaintiffs have their recourse only upon the mode accepted by them: the same as where articles of agreement are entered into for the sale of land, and afterwards a deed is made and bonds are given; the liability is then on the bonds. Since the case of *Milligan* v. *Brown,* the law is settled that where a receipt is given it discharges the co-obligor, and a release under seal is not required to produce this effect. 1 *Rawle* 391.

*Lewis,* for the defendant in error.

The money was to be paid on the delivery of the wheat, and the credit given was for the benefit of the defendants, and not of the plaintiff *Pollock.* The giving of the drafts alone would not extinguish the contract; but by the receipt of the 10th May, 1817, there was an express stipulation it should not be extinguished. No fair inference can be drawn from the receipt to *Tyson & Co.* "which when paid will be in full," that a new contract was entered into; on the contrary it is all one transaction, and shows the agreement was that the plaintiff would take this draft, which with the drafts taken the day before, would be in full. The drafts and receipts refer to the original contract; and the receipts show that the drafts were not taken as payment, but refer to the contract, and were to be in full of that and not of *Tyson's* part. There is a difference between the receipts here, and in the case of *Milligan* v. *Brown,*

William Tyson and others *v.* Thomas Pollock, who survived William
                              Pollock.)

1 *Rawle* 391, there the receipt was in full of the proportion of one
of the joint debtors to whom it was given: This court cannot infer
from the papers, an intention or agreement to discharge one of the
parties to the original contract: clear proof of such fact is requisite.
The inference is the other way; for the receipts are carefully drawn
to prevent such a conclusion.  Taking a security of the same grade,
or as collateral to a contract is no extinguishment.

*Durkee*, on the same side.

This contract is joint, the violence necessary to sever it must de-
stroy it.   There is no equity in the case, the defendants being all
principals; moreover the credit given being a benefit to all, is no
ground of equitable defence.   They are all a firm, and extension of
credit to any one of them, is a credit to all.   It cannot be pretend-
ed that where one partner gives his note or draft, payable at a
future day, and takes a receipt which when paid will be in full; that
that extinguishes the debt of the firm, because time was given dur-
ing which suit could not be maintained on it:   In case of sureties it
might be so.   But such transaction leaves the firm and every mem-
ber liable on the original contract, which they have neither satisfied
in law or equity.   Suppose instead of drafts, counterfeit money
had been given by *Byrnes & Co.* to the *Pollocks*, and the next day
*Tyson & Co.* paid them the balance, and took their receipt in full;
could it be pretended, upon a suit brought to recover the amount
of this spurious money, that such a receipt, or had it been a release,
would be a defence ?   It is true that where one of two joint debtors
is discharged by the obligor it is the discharge of both: but there
must be an intention evidenced by the discharge to produce such
effect.   The transaction with *Tyson & Co.* bears no resemblance
to that with *Watson*, in *Milligan* v. *Brown*, 1 *Rawle*, 391.   Unless the
receipt operates to discharge *Tyson*, his defence fails.   In *Milligan*
v. *Brown*, *Watson* agrees to pay two thousand dollars, expressly in
exoneration of his liability.   This was a turning point in the cause
and is of the very essence of it:   The effect of this agreement was
to discharge the other defendants, and this was not affected by the
intention of the plaintiff to hold them liable.   It is also necessary
that the defendants should establish that the drafts were accepted
in satisfaction of the part of *Tyson & Co.* this is not done by the
special verdict, and therefore cannot be inferred.   The receipt
should say in so many words that the drafts were so taken, or it
does not import it.

*Buchanan*, in reply.

There can be no doubt of the import of the receipt to *Tyson &
Co.* fraud or mistake is not pretended.   It is a receipt in full, with-
out limitation, and manifests the intention, upon the payment of
the amount for the wheat received by *Tyson & Co.* to discharge
them from all liability.   In the case of *Milligan* v. *Brown*, the

(William Tyson and others *v.* Thomas Pollock, who survived William Pollock.)

execution was issued upon a debt due, the receipt was taken in terms not so strong as in the receipt here, and it was expressly proved that there was no intention to discharge *Brown:* yet the law discharged him. Here also, it is not a person standing in the relation of *Watson,* but the party himself to whom the receipt was given, whilst his contract was executory.

The contract in its inception was joint, but was afterwards severed by the parties as is conclusively shown by the receipt to *Tyson & Co.* In the same manner as if A. and B. buy six horses for six hundred dollars, and the vendor takes their separate notes for three hundred dollars each: can it be supposed that in the event of the failure to pay, by one of the vendees, the liability of the other on the original contract would remain.

The wheat was divided, and separate receipts taken by the plaintiffs, who were to receive their pay in the money specified, instead of which they took the drafts of the defendants. The several receipts which had been taken for the wheat, were delivered up to the defendants respectively: they were the only evidence to charge them under this contract. The credit of forty-five days to *Byrnes & Co.* is a matter with which *Tyson & Co.* have nothing to do; it was given without their consent; they therefore very properly demanded of the *Pollocks* a receipt in full on the payment of their proportion. A severance was effected by the plaintiffs accepting negotiable security from *Byrnes & Co.* one day, and from *Tyson & Co.* the next, and the intention to sever is evidenced by the receipt in full. There would be no equity or justice in permitting the plaintiffs after giving *Byrnes & Co.* a credit of forty-five days, in which time they became insolvent, to recur to the original contract and revive the liability of *Tyson & Co.*

The opinion of the court was delivered by

GIBSON, C. J.—That the purchase was originally on separate account, has not been pretended at the bar. It was made by a *partnership* constituted not of individuals but of firms, and limited to the act of purchasing only. The original contract, then, being joint, binds both firms, unless it has been satisfied, or severed by substituting their several for their joint liability. I lay out of the case as a matter with which the vendors had nothing to do, the separate receipt by each firm, of its share of the purchased article; a separation of their interests by the partners themselves, being consistent with the contract of sale as well as with the object of the partnership. The first question then is, whether by the acceptance of bills drawn by each of the partner firms at York Haven, on its parent house at Baltimore, the joint contract was merged in their separate responsibility. By the terms of the sale, payment was to

40

(William Tyson and others *v.* Thomas Pollock, who survived William Pollock.)

be made, at the delivery of the article or on demand, in the notes of particular banks specified in the memorandum. At the time of delivery, separate receipts were given to the vendors, which they afterwards delivered up on receiving the bills on Baltimore. For these bills they gave to *Byrnes & Co.* a written acknowledgment of payment WHEN THE CONTENTS SHOULD BE RECEIVED; and to *Tyson & Co.* on the following day, a similar acknowledgment of payment IN FULL, on the same condition. The transaction, therefore, was evidently a mode of payment *by the partnership,* and if so, it can have no more effect in producing a severance of any unsatisfied joint responsibility, than if the partnership had paid in the bills of any third persons of which it had accidently become the holder. The bills of *Byrnes & Co.* can by no fair construction be considered as any thing else than payment *pro tanto* of the joint debts; and the bills of *Tyson & Co.* for the balance, which were agreed to be in full when they should be paid, clearly shows that it was so considered by the parties themselves. The difference in the terms of the receipts is remarkable; and I am unable to perceive how the omission to specify in the first also, that payment of the bills for which it was given should be in full, can be referred to any thing but an understanding that it should be in part, and consequently in part of the joint debt, as it could not be otherwise than in full if made on separate account. There is therefore, positive evidence on the face of the papers, that no severance was intended. But even without this, why should the separate acceptance of bills from each of two joint debtors, dissolve their joint liability more than would the separate acceptance of counterfeit bank notes or coin? All that the creditor has a right to require, is payment in fact, for whether joint or several can make no difference to him. Each partner is separately the agent of all the others, with authority to pay the whole or any part of the debts; and payment by him is essentially payment on joint account; so that the acceptance of securities from the individual partner does not necessarily or even naturally imply a relinquishment of any right against the partnership. Why then should the creditor be prejudiced in his relations with the partnership, by having accepted what he had no right to refuse? I take it, the responsibility of the partnership was not relinquished by it, unless the naked acceptance of the bills were satisfaction in law, without regard to the question of severance in fact, and this I proceed to consider.

In relation to the partnership, each of the partner firms may be treated as a stranger capable of dealing with it in the character of debtor or creditor; and as by the contract of sale, the wheat was to be paid for in the notes of particular banks, the subsequent acceptance of bills drawn by the partner firms, was payment in the bills of a stranger, of a *precedent* debt. On no other hypothesis

(William Tyson and others *v.* Thomas Pollock, who survived William Pollock.)

could there be the shadow of a defence; for as one simple contract will not merge in another, it has invariably been held that the debtor's own bill or note for the price of goods sold, will not extinguish the original liability. *Ld. Raym.* 1430. 2 *Stra.* 1218. *Willes,* 406. It merely operates as an extension of credit, and prevents a recurrence to the original contract of sale before the bill or note has come to maturity. 1 *Esp.* 3. We have then payment of a precedent debt in the bills of a third person, which has been universally held since *Clark* v. *Munden,* 1 *Salk.* 124, not to be absolute satisfaction, although it is otherwise where such payment has been in pursuance of the original bargain. I feel no disposition to review the authorities, but I may safely affirm that no case can be found in which any other doctrine was ever held, In *Sheely* v. *Mandeville,* 6 *Cranch,* 264, the acceptance of a bill was barely held to be a sufficient consideration for *an agreement* to discharge the precedent debt; which, when dependent on facts and circumstances, is a subject for the consideration of a jury. In *Arnold* v. *Camp,* 12 *Johns. R.* 409, acceptance of the separate note of one of the partners, was inferred to be satisfaction only from the fact that the *partnership note was given up,* a circumstance that does not enter into the case here. There are in fact no circumstances to take it out of the general rule, but enough to rebut a legal implication of satisfaction, even were the rule different. It would be decisive in any state of the law, that the parties themselves expressly agreed to take the bills as satisfaction only when they should be paid.

In this aspect, the authority of *Milliken* v. *Brown,* 1 *Rawle,* 391, makes the defendant's case neither better nor worse. If by the terms of the receipt given to *Tyson & Co.* the original contract were severed, or to be discharged by payment of that bill only, then *Tyson & Co.* would be exonerated, both jointly and separately, independently of the rule which gives one joint debtor the benefit of a release intended only for the other; and although the consequences might be important to *Byrnes & Co.* they could not add to the defence of *Tyson & Co.* which would be complete of itself. An absolute discharge of one of the debtors, is a postulate of the argument, which being once granted, makes an end of the question of joint liability, without regard to the question of liability by the other in a separate action. It seems to me that neither of these firms was discharged from the original contract, and that in every point of view, the cause is with the plaintiff.

SMITH, J.—Admitting the contract between the firm of *Tyson & Co.* and *Byrnes & Co.* and the Messrs. *Pollocks,* to be joint, (which however, might be doubted, were it not, that the parties had themselves admitted it to be so,) it does appear to me, that by the subsequent acts of the parties, it was *severed,* and the firm of *Tyson*

(William Tyson and others *v.* Thomas Pollock, who survived William Pollock.)

*& Co.* discharged from the performance of, or all liability on the same. The wheat was divided between *Tyson & Co.* and *Byrnes & Co.* and *W.* and *T. Pollock* accepted, on the 11th of May, 1817, from *Tyson & Co.* for their part of the wheat, a draft on *W.* and *N, Tyson,* of Baltimore, for three thousand six hundred and thirty-five dollars and eighty-seven cents, and receipted for the same, " as in full to that day." At maturity the draft was paid. On the day before, (the 10th of May, 1817,) the plaintiffs had received, four drafts from *Byrnes & Co.* on *Samuel Byrnes* of Baltimore, for four thousand six hundred dollars, for their part of the wheat, which last mentioned drafts were not paid. About five years and more after all this, the Messrs. *Pollocks* bring this suit to recover on the contract of the 5th of April, 1817, from *Tyson & Co.* the amount of the draft received by them on *Samuel Byrnes.* And for this sum and interest, amounting to six thousand five hundred and twenty-five dollars, the court below rendered judgment, being for the wheat received by *Byrnes & Co.* and of which *Tyson & Co.* did not receive a grain. These circumstances go to show, that the Messrs. *Pollocks* looked to each firm, for the amount of wheat received by them respectively, after the contract had been made, and discharged them from their original joint liability. I am, therefore, of the opinion, that the judgment should be reversed. A majority of this court, however, are of a different opinion, and the judgment must therefore be affirmed.

Judgment affirmed.

Ross, J. concurred with SMITH, J.